UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

GARY WARE,

                         *Plaintiff*,

       -against-

EASTERN WHOLESALE FENCE LLC
a/k/a EASTERN WHOLESALE FENCE
NY LLC,

                      *Defendant*.

_____

21-cv-3759

**COMPLAINT**

Plaintiff Gary Ware ("Ware"), by his undersigned counsel, alleges as follows for his Complaint against Defendant Eastern Wholesale Fence LLC a/k/a Eastern Wholesale Fence NY LLC (the "Company"):

## **INTRODUCTION**

1.     This case involves a high-performing manager who was subject to harassment, demotion and termination for taking protected medical leave for a disability, and for opposing the Company's discriminatory harassment.

2.     After being struck from behind by a forklift at work, Ware was taken to the hospital and later diagnosed with a tibial fracture, torn ACL, and related injuries that would leave him unable to walk or perform his normal duties for a period of months.

3.     The Company expressed frustration with Ware's disabling condition.

4.     Ware tried to reduce the Company's frustration level by performing the tasks he was able to perform despite being on FMLA leave.

5.     But that was not good enough for the Company, which harassed Ware and posted his job.

6.     When Ware opposed the Company's discriminatory treatment of him, the Company falsely accused him of being a poor performer and demoted him the day after he returned from his protected medical leave, and then concocted false accusations of misconduct against him and fired him the following day, leaving him with no income to support his family.

7.     For its disability discrimination and harassment and its retaliation and retaliatory harassment, the Company is liable to Ware under Article 15 of the New York State Human Rights Law, Executive Law § 290, *et seq.* and the regulations thereunder, which provide that "[a] current employee experiencing a temporary disability is protected by the Human Rights Law where the individual will be able to satisfactorily perform the duties of the job after a reasonable accommodation in the form of a reasonable time for recovery." N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 9, § 466.11.

8. The Company is also liable to Ware under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA") in that it interfered with his FMLA rights and retaliated against him for taking protected FMLA leave by harassing him during his medical leave, posting his job while on medical leave, falsely accusing him of being a poor performer one day after returning from medical leave, and firing him two days after returning from his medical leave.

## THE PARTIES, JURISDICTION & VENUE

9. Ware is a citizen and resident of the State of Alabama, residing in Madison County.

10. The Company is a corporation organized under the laws of Delaware, with its principal place of business at 266 Middle Island Rd., Medford, NY 11763, and is a citizen and resident of the State of New York for diversity purposes.

11. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because it arises under, *inter alia*, 29 U.S.C. § 2601, *et seq.*

12. This Court has supplemental jurisdiction over Ware's state law claims under 28 U.S.C. § 1367 because those claims arise from a common nucleus of operative facts.

13.     This Court also has diversity jurisdiction under 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

14.     Venue is proper under 28 U.S.C. § 1391(b) in that this District is where the Company resides, where Ware worked and lived when the underlying acts occurred, and where the acts complained of occurred.

15.     The Company's employees and agents whose actions and inactions are complained of herein were acting within the scope of their employment such that their acts were and are attributable to the Company.

## **FACTS**

16.     The preceding paragraphs are incorporated herein by reference.

17.     Ware's employment with the Company began on January 7, 2019, when Ware was hired as Assistant Director of Manufacturing.

18.     Ware quickly established himself as a high performer, and received a very good year-end performance review for 2019, along with a $22,000 salary increase.

19.     On May 13, 2020 Ware was promoted to Assistant Director of Manufacturing/Extrusions Manager, along with another salary increase, and the person he replaced was assigned to work as his assistant.

20.     As the Company's Assistant Director of Manufacturing/Extrusions Manager, Ware's work duties involved, *inter alia*, managing the Company's 24x7 extrusions plant, managing tooling shop operations, managing direct reports, participating in the weekly operations meeting, adjusting the process on extrusion lines for better performance and conducting test runs, evaluating, recommending and implementing new equipment on the production floor, and implementing and maintaining process and procedures on extrusion lines.

21.     At all material times herein Ware performed his duties with competence and diligence.

22.     Ware's 2020 year-end performance review was also very good and was accompanied by another salary increase, bringing his annual salary to $160,000.

23.     Shortly thereafter, on January 6, 2021, Ware was struck from behind by a forklift carrying a 2,000 pound super sack of material.

24.     911 was called and Ware was taken by ambulance to Peconic Medical Center in Riverhead, where X-rays and CT scans showed that he sustained, *inter alia*, a displaced tibia plateau fracture.

25.     On January 7, 2021, Ware's orthopedic doctor confirmed the injury and determined that Ware could not work until further notice, with an initial follow-up visit scheduled for February 4, 2021, because he could not walk, bear weight, or climb (all of which his job necessarily required), and had to ice and elevate his leg throughout the day to control the swelling and pain.

26.     On January 10, 2021, Ware was asked to attend, and did attend, a Zoom meeting to discuss production at the Company's Calverton facility.

27.     On January 11, 2021, Ware's boss Paul Wesnofske, the Company's Director of Manufacturing, called Ware and asked if he had a target date or goal for returning to work.

28.     In response, Ware explained the seriousness of his injury, that his doctor had him out on short-term disability until further notice, and that his next appointment was scheduled for February 4, 2021, which meant that he would at the very least be out until then.

29.    Wesnofske replied to Ware that if he set a goal in his head, he could probably get back before that date, that he just had to believe he could do it, and that doctors go by what you tell them.

30.    Ware responded by telling Wesnofske that the doctor indicated this was going to take some time and that he was certainly doing everything the doctor recommended to aid the recovery.

31.    While out on medical leave, Ware performed various work tasks on a daily basis from home.

32.    Such tasks included, without limitation, communicating with vendors, approving invoices, and communicating with co-workers.

33.    On January 12, 2021, Ware was sized and fitted for a hinged brace.

34.    On January 21, 2021, Wesnofske called Ware and told him they had a good day at the plant without Ware being there, to which Ware replied that it looks like he was not missed.

35.    That evening Wesnofske sent Ware an email indicating that he thought Ware's work activities had been quite limited while Ware was on medical leave, and that Ware should be back working at the plant even though he was entitled to take time off to get better. It stated:

Gary

I've had to start supervisor and line operator meetings. I did not know if you were going to continue with or not. We were running so badly I had to do something

Your involvement has been peripherally [sic], invoices, things like that, but not operationally (or as much as I knew of) so I stepped in

Your comment about "not actually missing work" kind of had me believing you wouldn't be involved

You are hurt and on WC. So you don't have to.

That all being said we still have a plant to run. I am holding Supv meetings (have one scheduled Friday). You are always welcome to join, but I don't think holding your own meetings while not in the plant is prudent (unless you are more involved than I'm aware-again, I don't know.

I need you back as soon as possible and I need this department to be managed sufficiently whether either of us are in the plant

I will send you the invite for tomorrow s meeting.

Paul L Wesnofske
Director of Manufacturing
Eastern Wholesale Fence LLC
274 Middle Island rd
Medford NY 11763
\*\*\*

36.    On January 22, 2021, Wesnofske emailed Ware discussing

operational difficulties in Ware's absence, acknowledging that Ware's next

doctor's appointment was February 4th, and asking if there was any possibility

for Ware to come back to the office before then perhaps for short days, to help Wesnofske manage the department.

37.     That same afternoon (January 22, 2021), Ware attended an extrusion supervisors' meeting via Zoom.

38.      After the meeting, Wesnofske asked Ware to stick around and talk, which Ware did.

39.     Wesnofske started off by saying how badly he needed Ware back because they were not running well and having process issues that he needed help with.

40.     Ware explained to Wesnofske that this was no fun for him and that he was losing a lot of money not working.

41.     Wesnofske replied that Ware wasn't losing money, and that he was collecting 75% of his pay tax-free.

42.     Ware then told Wesnofske that he was only collecting 30% of his pay due to the New York State cap on Workers Compensation.

43.     Wesnofske replied that he didn't think that was right, and that he would look into it with HR, but that if Ware came back to work he'd get full pay and the problem goes away.

44.     Wesnofske added that bonuses were being distributed soon, and that would help Ware out.

45.     On February 4, 2021, Ware was examined by his orthopedic doctor, who decided (and wrote in a doctor's note that Ware provided to the Company) that Ware could not work until further notice, and set a follow-up doctor's appointment for four weeks later.

46.     On or about February 8, 2021, Ware received FMLA paperwork from the Company.

47.      On February 10, 2021, the Company's HR Director, Victoria Kalligeros, emailed Ware to ask him to return the FMLA paperwork as soon as possible as his leave is considered unexcused without it, and to notify him that the FMLA paperwork would have been sent to him sooner, but the Company thought he was coming back with an accommodation.

48.     That afternoon, during a discussion between Wesnofske and Ware about the Company's operations, Wesnofske asked Ware how his physical therapy was going, and Ware told him not bad.

49.     Shortly thereafter, Wesnofske called Ware back and told him that the operation was running poorly and that he needed Ware back at work.

50.     Ware responded by telling him that he is injured, stressed out, and being made to fill out separate FMLA paperwork even though he had already provided doctor's notes for his medical leave.

51.     Wesnofske replied that if he came back to work now, all that paperwork goes away, and he gets full pay.

52.     Wesnofske then complained to Ware about the supervisors at work and their lack of communication, and asked Ware when he was coming back to work.

53.     Ware replied that the only thing he could say at that point was that he was doing the best he could, and doing what he could do to make a speedy recovery and that his next doctor's appointment was March 4, 2021.

54.     Thereafter, Ware continued doing all the work he could do from home, including making and responding to emails and calls, participating in web meetings and conference calls, approving invoices, etc.

55.     On February 21, 2021, Ware's orthopedic doctor completed the medical certification portion of the Company's FMLA paperwork, indicating that his best estimate of the end date for Ware's incapacity was March 18, 2021.

56.     On February 24, 2021, Ware provided the doctor's note and completed FMLA paperwork to the Company.

57.     On February 26, 2021, Ware learned that the Company had posted his job on Indeed, an employment website for job listings.

58.     Ware promptly told a co-worker (Mike McGill) about the posting and asked him about it.

59.     Ware also promptly called Wesnofske to ask him about why his job was posted, but the call went to voicemail.

60.     The next day (Saturday, February 27, 2021), the Company's HR Director Victoria Kalligeros left a voicemail on Ware's personal phone stating, in words or substance, that she heard that Mike McGill and Ware had a conversation regarding the posting; that she didn't want Ware to worry and they weren't getting rid of him; and that they weren't getting any good resumes for extrusion supervisors, so they decided to change the ad to a manager's position in hopes of getting better qualified candidates.

61.     Later that same day Ware received a phone call from Wesnofske, who initially avoided mentioning the job posting issue, but later said that even

though the position posted was for Ware's (Extrusion Plant Manager), it was not actually what Wesnofske was looking for.

62.     Wesnofske indicated to Ware that he wasn't getting acceptable resumes for extrusion supervisors, so they thought if they posted a higher paying position that they might get better talent or more responses.

63.     Wesnofske then told Ware that he thinks Ware doesn't want to come back to work.

64.     Ware asked Wesnofske why he would say something like that, and Wesnofske said Ware hadn't been involved in managing the plant.

65.     Ware disagreed with Wesnofske's characterization about how much work he was doing while on medical leave and complained that he was doing that work without pay because the Company had taken him off payroll.

66.     During that call Ware also complained that Wesnofske had been very cold and hostile towards him since he became injured.

67.     During that call Ware also complained that Wesnofske was (again) asking him to do something (return to work early) that he wasn't physically capable of doing.

68.     During that call Ware reminded Wesnofske that his projected return to work date was March 18, 2021.

69.     During that call Wesnofske told Ware about various companies that the Company was buying, and that two of them were in Florida and will need managers, and that perhaps Ware may want to go to Florida since New York is such a tough environment.

70.     During that call Wesnofske also told Ware that if the accident had happened to him, he would have been back to work the following week.

71.     Upon information and belief, on March 1, 2021 Wesnofske asked McGill what his opinion was about Ware's injury and how the situation has been handled.

72.     Upon information and belief, McGill then asked Wesnofske if he wants his honest opinion about that, and Wesnofske said yes.

73.     Upon information and belief, McGill then told Wesnofske as follows in sum and substance:  that Eastern is wrong; that it's fucked up the way Gary has been treated; that the guy gets run over by a forklift and you just kick him to the curb; that it seems like because extrusions production is down and scrap is up, you are taking it out on Gary; that those are two different issues

and you are combining them; that you had no issues with Gary before the accident; that the guy was doing his thing busting his ass and that minute the guy gets hurt, you're all over his ass and now he's a bum, it's wrong; that no wonder the guy feels like he does, you turned your back on him the minute he was of no use to you; that you're asking the guy to go against his doctor's orders and totally disregard his health; and that it's complete BS how the Company has handled this, and other employees see it.

74.    Upon information and belief, McGill also told Ware that HR Director Victoria Kalligeros wanted McGill to give a statement about what he had told Ware about the job posting.

75.    Upon information and belief, McGill also told Ware that he told Wesnofske that he will not give a statement, and if he were forced to do so, he would just quit now and leave, and that he did not want to be involved if there are any legal issues down the road.

76.    On or about the following day (March 2, 2021), the Company completed paperwork ending Ware's workers' compensation benefits as of February 24, 2021, and classifying Ware as being back on payroll as of that date.

77.     The following day (March 3, 2021), Wesnofske phoned Ware and told him, in words or substance, that he had met with Peter Williams Jr. (the Company's CEO) and Victoria Kalligeros (the Company's HR Director) to discuss Ware; that this whole situation with Ware's injury was getting way out of hand and too icky; that there is a lot of animosity between him and Ware, as well as tension between Ware and the Company; that they want to stop and put all of this to rest and move forward; that they want to make Ware whole; that they are going to put Ware back on payroll and pay him the difference in salary that he lost (roughly 70%) since his first workers' compensation check; that they all three felt like this had gotten way out of control after posting for an Extrusion Plant Manager position on Indeed; that in hindsight they probably could have handled that better; that he was upset that Ware reached out to Mike McGill about it; that they are willing to pay Ware full salary up to the day his FMLA ends; that Ware should chime in on maintenance emails and do whatever he can from home to help out now that he's being paid full salary; and that he should keep going to physical therapy and doctor's appointments and get his ass back to work as soon as possible.

78.     During Ware's March 4, 2021 follow-up medical appointment, Ware's orthopedic doctor adjusted Ware's expected return to work date by one week to March 25, 2021, which Ware promptly communicated to the Company.

79.     On March 5, 2021, Ware received a payroll check, along with a check retroactive to the date of injury for the difference between what he received from workers compensation and what he would have received had he not been taken off payroll.

80.     During the March 12, 2021 extrusions supervisors Zoom meeting, Wesnofske asked Ware what day of the week March 25th was (i.e., Ware's expected return to work date).

81.     Ware answered "Thursday, why?"

82.     Wesnofske replied, while grinning, "because you are working 16 hours that day."

83.     On March 17, 2021, Mike McGill told Ware that Wesnofske said he was going to make Ware work "a shitload of hours" upon his return to work the following week.

84.     On March 22, 2021, Ware's orthopedic doctor cleared Ware to return to work on March 25, 2021, with certain restrictions (i.e., no more than 8 hours per day, and no climbing), which Ware promptly communicated to the Company.

85.     Ware returned to work on March 25, 2021.

86.     Wesnofske was curt and far less communicative than normal with Ware that day, creating tension.

87.     Wesnofske told Ware that he was tired of working so many hours and wanted Ware to cover half a shift on the following Saturday starting at 6:00 a.m.

88.     Ware said ok.

89.     The following day (i.e., March 26, 2021, one day after returning to work), Ware was written up and demoted.

90.     Ware was called into a conference room with Wesnofske and HR Director Kalligeros, and Wesnofske said let's talk about the last two months (i.e., the time when Ware was on medical leave, but still performing tasks that he could from home).

91.     Wesnofske then recited a list of issues that took place over that time frame and effectively blamed Ware for all of it.

92.     Ware had an excellent work record, and there was no basis for any allegation that his work was deficient.

93.     Wesnofske told Ware that he was dropping the "Assistant Director" from his title (leaving him with a less distinguished title) and

18

requiring him to report to a new hire named Dan Wimberly who would be starting Monday with the title "Senior Extrusion Manager."

94.    Wesnofske said that the new hire (Wimberly) wasn't as technically sound as Ware on the processing side of extrusions, so he needed Ware to work with the guy and be his right hand man.

95.    Wesnofske also said he was angry that Ware spoke to Mike McGill when Ware was out about the Indeed job posting of Ware's position.

96.    Wesnofske indicated that Mike McGill said that Ware mentioned something about a lawsuit.

97.    Ware said that was not true, and that no such thing was ever mentioned.

98.    Wesnofske and Kalligeros said that's not what they heard.

99.    Wesnofske and Kalligeros asked Ware not to disclose what they talked about in their meeting.

100.    When the meeting ended, Ware requested a copy of the notes and written warning, and they said he would receive it.

101.   However, Ware was never given a copy of the notes or the written warning.

102.   Shortly thereafter, Ware was approached by McGill, who saw Ware's expression and asked him what's wrong.

103.   Ware avoided discussing what happened, and when McGill persisted, Ware told him that he could not talk about it.

104.   McGill asked again, and Ware replied that he just came from a meeting with Paul and Victoria, so you figure it out.

105.   At that time Ware was getting a call that he had to take, so he walked outside to take the call.

106.   When he came back in, he had a text message from McGill indicating that he had just quit.

107.   Ware asked McGill what happened, and McGill explained that he had walked into Wesnofske's office and quit, and that he wrote the CEO (Peter Williams Jr.) an email, with a "cc" to Wesnofske and Kalligeros, stating, in words or substance, that he has never worked at any company that was so disloyal to their employees, and that he can't work for someone like Wesnofske.

108.   The following day (Saturday, March 27, 2021), Ware reported to work at 6:00 a.m., as Wesnofske had asked him to do two days earlier.

109.   Later that morning, Ware was called into a conference room with Wesnofske and HR Director Kalligeros.

110.   They told Ware, in words or substance, that he had been instructed not to share what they had discussed with co-workers, and that he had done so.

111.   Ware said he had not done so.

112.   Wesnofske then interjected that this clearly isn't working, and that Ware seems like he doesn't want to be there.

113.   Wesnofske then started making false accusations that there were problems with Ware's performance even before the accident.

114.   Ware said that he disagreed, and that his annual review, pay increase and promotion just two months before the injury showed otherwise.

115.   Wesnofske said they just wanted to part ways with a clean break, and Kalligeros said based on the information or findings from yesterday, they are terminating Ware's employment.

116.   They then conveyed that Ware would be receiving a severance pay offer.

117.   Upon information and belief, Ware's replacement, Dan Wimberly, was not disabled at the time he was hired.

118.   Upon information and belief, the Company did not regard Ware's replacement, Dan Wimberly, as being disabled at the time he was hired.

## FIRST CAUSE OF ACTION

### DISABILITY DISCRIMINATION AND HARASSMENT
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

119.   The preceding paragraphs are incorporated by reference.

120.   The New York State Human Rights Law ("NYSHRL") and its implementing regulations make it unlawful for employers to discriminate against employees on account of a disability. New York Executive Law § 296(1) provides, in pertinent part:

It shall be an unlawful discriminatory practice:

(a) For an employer …, because of an individual's … disability … to … bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

***

(h) For an employer … to subject any individual to
harassment because of an individual's … disability …,
regardless of whether such harassment would be
considered severe or pervasive under precedent applied
to harassment claims. Such harassment is an unlawful
discriminatory practice when it subjects an individual to
inferior terms, conditions or privileges of employment
because of the individual's membership in one or more of
these protected categories. *** Nothing in this section
shall imply that an employee must demonstrate the
existence of an individual to whom the employee's
treatment must be compared. ***

121.    New York Executive Law § 292(21) states:

The term "disability" means (a) a physical, mental or
medical impairment resulting from anatomical,
physiological, genetic or neurological conditions which
prevents the exercise of a normal bodily function or is
demonstrable by medically accepted clinical or laboratory
diagnostic techniques or (b) a record of such an impairment
or (c) a condition regarded by others as such an impairment,
provided, however, that in all provisions of this article
dealing with employment, the term shall be limited to
disabilities which, upon the provision of reasonable
accommodations, do not prevent the complainant from
performing in a reasonable manner the activities involved in
the job or occupation sought or held.

122.    "[T]he term 'disability' is more broadly defined" under the

NYSHRL than under the Americans With Disabilities Act. *Reeves v. Johnson*

*Controls World Servs.*, 140 F.3d 144, 155 (2d Cir. 1998) (superseded in part on

other grounds by statute, 42 U.S.C. §12102(3)(A)) (quoting *State Div. of Human Rights ex rel. McDermott v. Xerox Corp.*, 65 N.Y.2d 213, 218 (1985); *Ugactz v. UPS, Inc.*, 2013 U.S. Dist. LEXIS 43481, at *52 (E.D.N.Y. Mar. 26, 2013) (same); *Miller v. E. Midwood Hebrew Day Sch.*, 2021 U.S. Dist. LEXIS 28898, at *10 (E.D.N.Y. Feb. 15, 2021) (same).

123.   Specifically, "any 'medically diagnosable impairment' is a disability under the NYSHRL." *Baron v. Advanced Asset & Prop. Mgmt. Sols.*, LLC, 15 F. Supp. 3d 274, 282 (E.D.N.Y. 2014) (citing *Barr v. N.Y.C. Trans. Auth.*, 2002 U.S. Dist. LEXIS 2968, at *8 (E.D.N.Y. Feb. 20, 2002)); *Croons v. N.Y. State Office of Mental Health*, 18 F. Supp. 3d 193, 213 (N.D.N.Y. 2014) (same); *Levy v. Chevrolet (In re Estate of Levy)*, 2008 U.S. Dist. LEXIS 101701, at *22 (E.D.N.Y. Dec. 17, 2008) (same).

124.   "[R]egulations implementing the NYSHRL provide [that] '[a] current employee experiencing a temporary disability is protected by the Human Rights Law where the individual will be able to satisfactorily perform the duties of the job after a reasonable accommodation in the form of a reasonable time for recovery.'" *Miloscia v. B.R. Guest Holdings LLC*, 33 Misc. 3d 466, 475 (N.Y. Sup. 2011), *aff'd in relevant part,* 94 A.D.3d 563 (1st Dept. 2012) (citing 9 NYCRR 466.11(i)(1); *Borbon v. Area 145, Inc.*, 2015 N.Y.

Misc. LEXIS 4985, at *12 (N.Y. Sup. 2015) (same, citing 9 NYCRR 466.11(i)(1)); see also *Attis v. Solow Realty Dev. Co.*, 522 F. Supp. 2d 623, 631 (S.D.N.Y. 2007) (dismissing ADA discrimination claim but not analogous NYSHRL claim where the plaintiff suffered a temporary injury); *Kong v. Wing Keung Enters.*, 2017 U.S. Dist. LEXIS 205331, at *7 (E.D.N.Y. Aug. 8, 2017) (to same effect; dismissing ADA discrimination claim on basis that temporarily disabling condition was not a disability under the ADA, but declining to dismiss NYSHRL claim on that basis).

125.   The Second Circuit has clarified that even the ADA—which affords less protection than the NYSHRL—covers "transitory impairments lasting or expected to last less than six months[.]" *Hamilton v. Westchester County*, No. 20-1058-pr, 2021 U.S. App. LEXIS 19407, at *12 (2d Cir. June 30, 2021) (knee injury case).

126.   Ware's above-referenced tibial fracture, torn ACL, and related injuries caused medically diagnosable impairments, e.g., inability to walk, bear weight, climb stairs, etc., which constituted a disability under the NYSHRL and its implementing regulations.

127.   Those medically diagnosable impairments will require ACL reconstruction and meniscus surgery, and, upon information and belief, will cause Ware to eventually need a knee replacement.

128.   Ware was capable of satisfactorily performing the duties of the job after a reasonable accommodation, including, without limitation, an accommodation in the form of a reasonable time for recovery. 9 NYCRR 466.11(i)(1); see also *Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 445 (E.D.N.Y. 2009) (Bianco, J.) (Generally, "[a] request for a leave of absence is unreasonable 'only in unusual circumstances.'") (citation omitted).

129.   Because of Ware's medically diagnosed impairments (*i.e.*, disability), the Company harassed Ware and discriminated against him in compensation and in the terms, conditions and privileges of his employment.

130.   The Company did so by, *inter alia*:

(A)   Pushing Ware to do as much work as possible while on medical leave, but without paying him anything for such work until after the Company's mistreatment of Ware was challenged by Ware's co-worker McGill.

(B)  Effectively accusing Ware of taking advantage of his impairment to limit the amount of work he could do, and of exaggerating the amount of time he needed to heal;

(C)  Posting Ware's job;

(D)  Falsely accusing Ware, one day after returning from medical leave, of having performed his job unsatisfactorily over the past two months (i.e., during the period of time when he was on medical leave) and of having done so even before then;

(E)  Giving Ware a less distinguished title and ordering him to report to, and train, his replacement; and

(F)  Terminating Ware just two days after his official return to work.

See, e.g., *Lundy v. Town of Brighton*, 732 F. Supp. 2d 263, 277 (W.D.N.Y. 2010) (supervisor's conduct in "implying that [plaintiff] was faking, or at least exaggerating, her injury, and that he wanted to keep a tighter rein on her ability to take time off for medical or other reasons" could be considered by jury "as evidence that [supervisor's] attitude toward plaintiff changed around the time that she filed her SDHR complaint, which might in turn tend to show that his insistence that she go to IDS, and his frequent changes to her work schedule, were motivated in part by retaliation.").

131.   Ware's physical impairment (i.e., disability) was one of the "but for" reasons he was harassed while on medical leave, falsely accused of having performed his job unsatisfactorily during the period when he was on medical leave and of having done so even before then, demoted one day after returning from his protected medical leave, and falsely accused of misconduct and terminated two days after returning from his protected medical leave.

132.   Moreover, to the extent the Company's acts were motivated by retaliatory impulses as discussed below, that is no bar to Plaintiff's disability discrimination and harassment claim because "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 854 (2d Cir. 2013) (citations omitted).

133.   As a result of its above-referenced conduct, the Company is liable for all damages caused and all appropriate relief, including, *inter alia*, back pay, front pay, loss of benefits, compensatory damages (including the stress, anxiety and emotional pain that comes when a man's status as provider for his family is taken away or impaired) and attorney's fees, as well as punitive damages, which should be imposed due to the reprehensible nature of Defendant's conduct and the compelling public interest in deterring illegal discrimination.

## SECOND CAUSE OF ACTION

## RETALIATION AND RETALIATORY HARASSMENT
## IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

134.   Ware incorporates the preceding paragraphs by reference.

135.   New York Executive Law § 296(1) provides, in pertinent part:

It shall be an unlawful discriminatory practice: *** (h) For
an employer … to subject any individual to harassment …
because the individual has opposed any practices forbidden
under this article or because the individual has filed a
complaint, testified or assisted in any proceeding under this
article, regardless of whether such harassment would be
considered severe or pervasive under precedent applied to
harassment claims. Such harassment is an unlawful
discriminatory practice when it subjects an individual to
inferior terms, conditions or privileges of employment
because of the individual's membership in one or more of
these protected categories. *** Nothing in this section shall
imply that an employee must demonstrate the existence of
an individual to whom the employee's treatment must be
compared. ***

136.   New York Executive Law § 296(7) provides:

It shall be an unlawful discriminatory practice for any
person engaged in any activity to which this section applies
to retaliate or discriminate against any person because he or
she has opposed any practices forbidden under this article or
because he or she has filed a complaint, testified or assisted
in any proceeding under this article.

137.   While "[t]he Supreme Court has recognized that opposition can be

manifested subtly—without uttering a firm 'no'" (*Dillon v. Ned Mgmt.*, 85 F.

Supp. 3d 639, 660 (E.D.N.Y. 2015) (citing *Crawford v. Metro. Gov't of*

*Nashville & Davidson Cty.*, 555 U.S. 271, 277 (2009)); see also *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (Posner, J.) ("Passive resistance is a time-honored form of opposition[.]"); *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 479 (2009) (to similar effect), Ware's opposition was not merely passive.

138.    Rather, Ware consistently opposed his boss's repeated discriminatory efforts to pressure him into returning to work before he was healed, and also consistently opposed the Company's discrimination against him on the basis of his physical impairments (i.e., disability) by, *inter alia*:

(A)    Disputing and expressing disapproval on multiple occasions of Wesnofske's discriminatory statements/negative stereotypes about Ware's need for continued medical leave;

(B)    Disputing Wesnofske's characterization about how much work he was doing while on medical leave, and complaining that he was doing that work without pay because the Company had taken him off payroll;

(C)    Complaining to Wesnofske about his coldness and hostility towards Ware since becoming injured and about his posting of Ware's position while he was on medical leave;

(D)     Complaining that Wesnofske was repeatedly asking him to do

something (return to work early) that he wasn't physically capable

of doing; and

(E)     telling a concerned co-worker (McGill) that he had just come from

a meeting with Wesnofske and Kalligeros (i.e., the meeting where

Ware was demoted) and that he (McGill) can figure it out (which,

in the context of Ware's troubled expression and McGill's earlier

statements to Wesnofske, permitted McGill to infer that

Wesnofske and Kalligeros had taken adverse action against Ware

for having been on medical leave).

139.   Ware's oppositional conduct as stated above surpasses the

threshold for what constitutes protected oppositional conduct. See, e.g., *Blakely*

*v. Big Lots Stores, Inc.*, 2014 U.S. Dist. LEXIS 119823, at *36-38 (N.D. Ind.

2014) (denying summary judgment because "when [plaintiff's manager] told

plaintiff that she needed to diversity her store, plaintiff responded that she did

not agree" *** A reasonable jury could conclude that [plaintiff's manager]

believed plaintiff was resisting his alleged attempts to terminate African-

American employees"); *Leyba v. New Mexico*, 2003 U.S. Dist. LEXIS 30361, at

*18 (D.N.M. 2003) ("A jury could reasonably construe Plaintiffs' voicing of

disapproval of the photographs as conveying their opposition to sex-based

discrimination or harassment in the workplace."); *Verstraete v. Farmers Ins. Co., Inc.*, 1994 WL 373890 *4 (D.Kan. 1994) ("[F]or reasons of discretion, tact, insecurity, or otherwise, employees do not always brazenly lodge direct allegations of discrimination but may instead simply voice their concerns about the propriety of certain actions … the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer."); *Albunio v. City of N.Y.*, *supra* (to similar effect).

140.   Ware's oppositional conduct was one of the "but for" reasons he was harassed while on medical leave, falsely accused of having performed his job unsatisfactorily during the period when he was on medical leave and of having done so even before then, demoted one day after returning from his protected medical leave, and falsely accused of misconduct and terminated two days after returning from his protected medical leave.

141.   In addition, *inter alia*, based on Wesnofske and Kalligeros' expressed belief that Ware was planning to sue the Company about its treatment of him since becoming physically impaired, and its effort to cover its tracks shortly thereafter by paying Ware's unpaid wages since the date he became physically impaired, followed by its demotion and termination of Ware, it is reasonable to infer that the Company's belief that Ware was planning to sue the

Company about its treatment of him since becoming physically impaired was one of the "but for" causes of Ware's demotion and termination. See, e.g., *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 879 (2d Cir. 1988) (citing *Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir.1987) with approval for the proposition that "finding section [29 U.S.C. 215(a)(3)] liability [is proper] even where retaliation [is] based upon employer's mistaken belief that employee engaged in protected activities[.]"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (stating that Title VII's anti-retaliation provision should be expansively construed to prevent "a perverse incentive for employers to fire employees who might bring Title VII claims.").

142.   Further, based on the Company's immediate termination of Ware after McGill unexpectedly resigned and chastised the Company in writing, it is reasonable to infer that the Company: **(A)** linked McGill's conduct to Ware and to McGill's earlier related opposition to Wesnofske's mistreatment of Ware due to his physical impairment; **(B)** was vicariously retaliating against Ware for McGill's earlier statements and his quitting and complaining to protest the Company's above-referenced mistreatment of Ware; and **(C)** that such retaliation was one of the "but for" causes of Ware's termination. See, e.g., *Gonzalez v. Nyu Langone Med. Ctr.*, 2019 U.S. Dist. LEXIS 149902, at *16-17 (S.D.N.Y. Sep. 3, 2019) (finding that actions by a third-party can be the basis of

a plaintiff's retaliation claim under, *inter alia*, the NYSHRL) (citing, *inter alia*, *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993) ("The causal link in the present case between the person engaging in the protected activity and the person retaliated against is clear, because the person, allegedly engaging in protected activity, was protesting the allegedly unlawful discharge of Whitfield and was allegedly acting on his behalf.")).

## THIRD CAUSE OF ACTION

## UNLAWFUL RETALIATION UNDER THE FMLA

143.   Ware incorporates the preceding paragraphs by reference.

144.   Ware had over 1,250 hours of service to Defendants during the 12-month period preceding his medical leave and termination.

145.   Ware was therefore an eligible employee under the FMLA.

146.   Throughout his employment, Ware worked for an employer (the Company) that had over 50 employees in a 75-mile radius.

147.   The Company is therefore a "covered employer" under the FMLA.

148.   Ware gave notice to the Company of his intention to take FMLA leave through March 18, 2021, with a follow-up doctor's note extending his medical leave to March 25, 2021.

149.   Ware did not exhaust his available FMLA leave.  29 U.S.C. § 2612(a)(1)(D).

150.   The medical leave Ware took from the date he was injured through March 25, 2021 was for an "injury, impairment, or physical … condition that involves … (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

151.   Ware was denied benefits to which he was entitled under FMLA, including: **(A)** during certain periods of his medical leave, the right to take leave for the treatment of a serious health condition without being required to work, particularly without pay (29 U.S.C. § 2612(a)(1); *Arban v. West Publishing Corp.*, 345 F.3d 390, 405 (6th Cir. 2003) (asking employee to perform work-related tasks while he was on medical leave interfered with his rights under the FMLA)); and **(B)** the right to be reinstated to his former position or an equivalent one at the end of leave (29 U.S.C. § 2614(a)) even though he was capable of performing the essential functions of his position at the end of his FMLA leave.

152.   It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1).

153.   The regulations, moreover, make clear that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  29 C.F.R. § 825.220(c).

154.   Ware's taking of FMLA leave was one of the "but for" reasons he was harassed while on medical leave, falsely accused of having performed his job unsatisfactorily during the period when he was on medical leave and of having done so even before then, demoted one day after returning from his protected medical leave, and falsely accused of misconduct and terminated two days after returning from his protected medical leave.

155.   Because of the Company's FMLA violations, the Company is liable to Ware for, *inter alia*, lost wages and benefits (including back pay and front pay), liquidated damages, attorney's fees, interest and such other and further relief as may be appropriate.  See, e.g., 29 U.S.C. § 2617(a)(1).

## FOURTH CAUSE OF ACTION

## FMLA RETALIATION (29 U.S.C. § 2615(a)(1))

156.   Ware incorporates the preceding paragraphs by reference.

157.   29 U.S.C. § 2615(a)(1), which prohibits employers from "interfer[ing] with ... the exercise of [FMLA rights]," also prohibits retaliation.

158.   Interference is defined to include "discriminating or *retaliating* against an employee ... for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c) (emphasis added).  *Smith v. Westchester County*, 769 F.Supp.2d 448, 470 (S.D.N.Y. 2011).

159.   Ware exercised right protected under the FMLA, e.g., taking protected medical leave.

160.   Ware was qualified for his position.

161.   Ware suffered adverse employment actions, e.g., he was harassed while on medical leave, falsely accused of having performed his job unsatisfactorily during the period when he was on medical leave and of having done so even before then, demoted one day after returning from his protected medical leave, and falsely accused of misconduct and terminated two days after returning from his protected medical leave.

162.   "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 471 (S.D.N.Y. 2011) (citing *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).

163.   The complained of conduct above "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 471 (S.D.N.Y. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

164.   The complained of conduct above occurred under circumstances giving rise to an inference of retaliatory intent, as most of them were linked to Ware's medical leave, and all of them occurred either during Ware's protected medical leave or within two days thereafter.

165.   The Company's retaliation against Ware for having exercised his FMLA rights was one of the "but for" reasons the Company undertook the challenged conduct above.

166.   Because of Defendants' FMLA violations, Defendants are liable for, *inter alia*, lost wages and benefits (including back pay and front pay),

liquidated damages, attorney's fees, interest and such other and further relief as may be appropriate. *See*, *e.g.*, 29 U.S.C. § 2617(a)(1).

## **CONCLUSION**

167.   WHEREFORE, Ware requests judgment as follows:

(A)   On his NYSHRL claims, a judgment that includes, *inter alia*, back pay, front pay, loss of benefits, compensatory damages, and punitive damages;

(B)   On his FLMA claims, a judgment that includes, *inter alia*, back pay, front pay, loss of past and future benefits, and liquidated damages; and

(C)   On all claims, attorney's fees, costs, disbursements, and such other and further relief as is just and proper, including an offset for the negative tax consequences of receiving a lump sum payment for lost wages and benefits (see *Eshelman v. Agere Sys.*, 554 F.3d 426, 442 (3d Cir. 2009)).

**JURY TRIAL DEMANDED:**  Ware demands a trial by jury with respect to all claims so triable.

Dated:  July 2, 2021          Law Offices of Scott A. Lucas

By:   */S/ Scott A. Lucas*
Scott A. Lucas
200 Park Avenue, Suite 1700
New York, New York 10166
(direct) (646) 342-1139
(office) (646) 632-3737
*Attorneys for Plaintiff Gary Ware*